**ORIGINAL**

1  Martin A. Little, Esq.
   Nevada Bar No. 7067
2  M. Daron Dorsey, Esq.
   Nevada Bar No. 7680
3  JOLLEY, URGA, WIRTH & WOODBURY
   3800 Howard Hughes Parkway/16th Floor
4  Las Vegas, Nevada 89109
   Telephone: (702) 699-7500
5  Facsimile: (702) 699-7555

6  Brian Kenney, Esq.
   LAW OFFICES OF BRIAN P. KENNEY
7  1617 John F. Kennedy Blvd. Suite 640
   Philadelphia, PA 19103
8  Telephone: (215) 569-8840
   *Pro Hac Vice* Application Pending
9
   Brian P. McCafferty, Esq.
10 PROVOST UMPHERY LAW FIRM.
   1617 John F. Kennedy Blvd. Suite 640
11 Philadelphia, PA 19103
   Telephone: (215) 569-8840
12 *Pro Hac Vice* Application Pending

13
   *Attorneys for Qui Tam Plaintiffs*
14

15                  UNITED STATES DISTRICT COURT

16                        DISTRICT           CV-S-03-0667-LRH-RJJ

17 UNITED STATES OF AMERICA                )
   Ex rel. LEO SWEENEY,                    )
18 RITA KAYE and MARK BARTH,                )
                                            )
19        Plaintiffs,                       )
                                            )   **COMPLAINT**
20        vs.                               )
                                            )   **FILED IN CAMERA AND**
21 SELECT MEDICAL CORPORATION,              )   **UNDER SEAL**
   SPORTS THERAPY ARTHRITHIS                )
22 REHABILITATION, INC., and                )
   SPORT AND ORTHOPEDIC                    )
23 REHABILITATION SERVICES OF              )
   FLORIDA                                  )
24                                          )
          Defendants.                       )
25 _____ )

26        Relators-Plaintiffs Leo Sweeney, Rita Kaye and Mark Barth, by and through their

27 attorneys, Jolley, Urga, Wirth & Woodbury, Brian P. Kenney, Esq., and Provost Umphrey Law

28 Firm, L.L.P., file this Federal False Claims Act Complaint, *under seal*, against Defendants Select

S:\MAL\SWEENEY 7538-20000\PLD\COMPLAINT.wpd



Medical Corporation ("Select Medical"), Sports Therapy Arthritis Rehabilitation, Inc., a Nevada Corporation d/b/a Nova Care, ("STAR") and Sport and Orthopedic Rehabilitation Services of Florida ("SORS").

## I.

## NATURE OF THE CASE

1. Relators-Plaintiffs' case arises from the Defendants' violations of the False Claims Act, 31 U.S.C. §§ 3729-3733. This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims presented by Defendants to certain agencies of the United States government.

2. Defendants to this action submitted, caused to be submitted, and/or conspired to submit or cause to be submitted false and fraudulent claims for payment by the United States through the Medicare and Medicaid programs for the provision of medical services.

## II.

## JURISDICTION AND VENUE

3. This court has jurisdiction over the subject matter of this lawsuit pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 1345, as well as 31 U.S.C. § 3732.

4. Venue is proper in the District of Nevada because Defendants reside within this judicial district by virtue of the fact that they maintain offices within this judicial district, transact business within this judicial district, and committed the false and fraudulent acts complained of within this judicial district.

## III.

## PARTIES

5. Relator-Plaintiff Leo Sweeney is a resident of Nevada who was employed as a health care consultant to perform contractual work for Defendants Select Medical and STAR.

6. Relator-Plaintiff Rita Kaye is a resident of Nevada who was employed by Defendant Select Medical and its predecessors for approximately 17 years in Las Vegas, Nevada.

7. Relator-Plaintiff Mark Barth is a resident of Florida and was an employee of Defendant SORS, which is owned and operated by Defendant Select Medical.

8. Defendant Select Medical operates 68 specialty long-term acute care hospitals in 22 states and operates approximately 740 outpatient rehabilitation clinics in the United States and Canada. Select Medical is a publicly traded company on the New York Stock Exchange (ticker symbol SEM), and its company headquarters are located in Mechanicsburg, Pennsylvania.

9. Defendant STAR is a subsidiary of Select Medical that performs outpatient rehabilitation services, including physical therapy. STAR did business under the name NovaCare Outpatient Rehabilitation. Defendant Select Medical purchased STAR in November of 1999.

10. Defendant SORS is owned and operated by Defendant Select Medical. SORS operates clinics in the State of Florida and performs outpatient rehabilitation services, including physical therapy.

## IV.

## THE FEDERAL FALSE CLAIMS ACT

11. The False Claims Act ("FCA") provides in pertinent part, that:

> (a) Any person who . . . (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;
> . . .
>
> * * *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .
>
> (b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

/ / /

/ / /

/ / /

## V.

## THE MEDICAID PROGRAM

12. At all times relevant to this Complaint, the Medicaid Program was intended to assist poor persons and other qualified people in paying for the cost of health care. Medicaid is a federal-state matching program in which both the federal and state governments are required to contribute a specified percentage of total expenditures. It is administered by the individual states. The Social Security Act and federal regulations establish minimal levels of coverage that states must provide in order to operate a Medicaid program. Federal law and regulations also establish optional coverage categories, all or part of which the states may choose to cover. Each state covers the required services and eligibility groups to cover. While states are responsible for the hands-on operation of Medicaid, the federal government plays an active oversight role. The Health Care Financing Administration ("HCFA"), part of the U.S. Health and Human Services Department, oversees the Medicaid program. HCFA approves the Medicaid State Plan that each state created, as well as any waivers for which states apply. The Medicaid Program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates in a manner similar to that used in the Medicare Program.

## VI.

## THE MEDICARE PROGRAM

13. At all times relevant to this Complaint, the Medicare Program was a federally funded and administered program intended to assist elderly persons in paying for the cost of health care. The Medicare Program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates. Reimbursements are made out of the Medicare Trust Fund. The Medicare Trust Fund is supposed to reimburse health care providers, such as Defendants here, only for those services that were actually performed and were medically necessary for the health of the patient and that were ordered specifically by a physician, using appropriate medical judgment and acting in the best interest of the patient. The Medicare Trust Fund relies on the implied representations of the suppliers of the Medicare services, reimbursable in whole or in part under Medicare, that the services billed by the providers are medically necessary for the patient and are

actually performed as billed and compensable by Medicare. Medicare requires that the service has to be physically performed and billed according to Medicare policies and procedures code. HCFA also oversees the Medicare program. Regional intermediaries acting for Medicare set the compensation rates for services by assigning a specific amount of money to each five-digit Medicare code (the CPT code), which code identifies with particularity the nature of the service performed.

14. The Defendants have received significant revenue from the United States Government through provisions of the Medicare program (administered under Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg), and the Medicaid program (administered under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v).

## VII.

## THE FALSE CLAIMS SCHEMES

15. Prior to her unlawful termination, Relator Rita Kaye had worked for STAR and its predecessors in Las Vegas, Nevada since 1985. Back in 1985, when Relator Kaye started with STAR, STAR was owned by a group of individuals (including Larry Urben) who hired Kaye to supervise the billing and account receivables department.

16. In 1993, STAR was generating approximately $2.5 million in revenues and at that time, STAR was sold to Rehabilitation Clinics, Inc. ("RCI"), who was a subsidiary of NovaCare Outpatient Rehabilitation ("NovaCare"). Some of the unlawful schemes and practices identified in this Complaint began occurring within months of the sale of STAR to RCI.

17. NovaCare merged STAR's Nevada based operation into a national company that did business in several states, including many in the Southwestern United States such as Texas, New Mexico, Colorado, and Arizona. For example, NovaCare attempted to close the Nevada billing center which Relator Kaye had overseen, and sought to centralize billing for the southwestern states into one central billing office in Phoenix, Arizona.

18. NovaCare's attempt to merge STAR's billing functions into one central billing office in Arizona was a disaster. First, the attempt to merge STAR's billing functions with operations in Arizona failed such that STAR's Nevada billings were never incorporated into the

Arizona billing office. In fact, several months after closing the Nevada billing office and removing STAR's billing files from Nevada, NovaCare sent all of these files back to Nevada. In the transition process, many of the Nevada files were lost or misplaced, and in the months that had elapsed none of the Nevada billing had been processed.

19. In November of 1999, Defendant Select Medical purchased NovaCare, as well as its subsidiaries, including RCI. Defendant Select Medical often expanded upon the fraudulent schemes and practices that existed at NovaCare prior to the sale to Select Medical, and in many instances Select Medical introduced new fraudulent and illegal schemes after it took control of NovaCare's operations.

20. In December of 1998, Relator Leo Sweeney was hired on as an independent contractor by STAR/NovaCare to act as a health care consultant. Specifically, Relator Sweeney was hired to assist Relator Rita Kaye, STAR/NovaCare's billing administrator, in reconciling and correcting the ongoing billing problems at the STAR facilities, some of which were related to the ill-fated attempt to centralize STAR's billing functions into an Arizona central billing center. In March of 2000, Relator Sweeney became an employee of STAR/NovaCare and was put in STAR/NovaCare's payroll.

21. After his complaints regarding STAR/NovaCare's fraudulent practices were not addressed, Realtor Sweeney took a leave of absence from the company, and ultimately STAR/NovaCare terminated Relator Sweeney's employment on June 28, 2001.

## VIII.

### SORS MEDICARE FRAUD IN FLORIDA

22. Relator Mark Barth was hired by Defendant SORS in January of 2000 to serve as a Marketing Representative for SORS, which operated eleven (11) physical therapy clinics in the Tampa, Florida area.

23. During the time that Relator Barth worked for SORS, he became aware that SORS was engaging in billing practices for physical therapy which were contrary to Medicare's rules and regulations.

24. In order to bill Medicare for physical therapy services, only a licensed Physical Therapist ("PT") with a Medicare provider number, or a licensed Assistant PT supervised by a PT with a Medicare provider number can perform the therapy for which Medicare is being billed. Moreover, in order to bill Medicare for individual therapy services, a PT or Assistant PT must be working one-on-one with the Medicare patient. Barth observed that SORS was violating both of these requirements while he was employed at SORS.

25. Specifically, Barth observed that Medicare patients were being given physical therapy by unlicensed "rehab technicians" and SORS was billing Medicare for those services by knowingly misrepresenting that a licensed PT was performing those services. This occurred primarily in situations which involved aquatic therapy.

26. Additionally, Barth became aware that SORS was billing Medicare for individual therapy sessions in situations where individual one-on-one therapy services were not being provided and the PT was either supervising several patients engaged in different therapy tasks, or supervising patients in "group" therapy activities.

27. Relator Barth was terminated in April 2002, at least in part because he called these fraudulent Medicare billing practices into question.

## IX.

## BALANCE BILLING SCHEME

28. In order to illegally increase revenues, Defendants Select Medical and STAR engaged in the practice of billing Medicare patients for services beyond the amount approved by Medicare.

29. Pursuant to Medicare regulations, Medicare providers cannot bill all sources of payment a total of more than the Medicare approved amount for a particular medical treatment or service. After Medicare pays its share of the approved amount (usually 80%), the Medicare provider may bill the patient or a private supplemental insurance carrier for the remaining 20% of the Medicare approved amount.

30. In clear violation of these Medicare regulations, Defendants Select Medical and STAR sent bills to Medicare patients for payment for services for amounts in excess of the entire Medicare approved amount.

31. For example, if Select Medical's normal rate for a treatment ("the private rate") was $100.00, but Medicare only approved payment of $80.00 for that treatment, Defendants Select Medical and STAR were billing Medicare patients for the difference between the private rate of $100.00 and the Medicare-approved rate of $80.00. Defendants Select Medical and STAR were billing these patients even if they had received full payment of the $80.00 Medicare-approved rate.

32. Defendants Select Medical and STAR compounded their intentional and wrongful conduct by coercing Medicare patients to make the illegal payments of the balance billing through threats of ruining the patients' credit and using collection agencies to harass patients into paying these "balance billing" payments.

## X.

## **OVERBILLING OF THERAPY TREATMENT CHARGES**

33. As far back as 1994, and until at least December 2000, Defendants Select Medical and STAR engaged in overbilling practices for therapy treatment charges at Las Vegas area clinics. Upon information and belief, these practices are ongoing at the Las Vegas STAR/Nova Care clinics.

34. As far back as 1994, Alex Delgado, Select Medical's Clinical Operations Director for NovaCare Rehabilitation, instructed front desk clerks working at NovaCare Rehabilitation clinics in the Las Vegas area to mark and bill a minimum of five therapy treatment charges for each and every Medicare patient who entered the clinics, regardless of the actual number of therapy treatments received by the patient.

35. This policy was implemented after Delgado expressed frustration and decided that NovaCare Rehabilitation was being grossly under-compensated for its services by Medicare because of Medicare's 80%/20% reimbursement fee schedule only for Medicare approved amounts.

36. As a result of this policy, it is estimated that hundreds and possibly thousands of false claims for payment were submitted to Medicare by Defendant Select Medical's NovaCare Rehabilitation entity for services which were never rendered and/or were not medically necessary for the health of the patient.

## XI.

## FRAUDULENT RESUBMISSION OF REJECTED MEDICARE CLAIMS

37. As far back as 1994, and until at least December 2000, Defendants Select Medical and STAR also engaged in a practice of fraudulently changing dates and forging signatures in order to resubmit claims to Medicare that had already been previously rejected by Medicare under the guise that they were "new" claims for recently performed services. Upon information and belief, these practices are ongoing at the Las Vegas STAR/Nova Care clinics.

38. As far back as 1994, Alex Delgado, Select Medical's Clinical Operations Director for NovaCare Rehabilitation, ordered office clerks working at least eight (8) NovaCare Rehabilitation clinics in the Las Vegas area to change dates and forge signatures related to "old" Medicare claims, that had already been rejected for payment by Medicare, in order to deceive Medicare into making payment for what Medicare thought were "new" claims for recently provided medical treatments and services.

39. For example, if Medicare rejected claims for payment because of medical charts that were not in compliance with Medicare guidelines, Delgado ordered Select Medical/NovaCare office employees (who were not physicians) to fraudulently "fix" the rejected patient charts and alter the dates on the Medicare 700 and 701 forms so that the charts would be in compliance and Medicare could be billed again for the same services for which Medicare had previously refused payment.

40. Additionally, Delgado instructed Select Medical/NovaCare office employees to contact physicians and request them to re-sign and re-date their old signatures of the Medicare forms for the services that had been long-ago provided and for which payment had been rejected by Medicare.

41.     Most or all of the physicians contacted refused to engage in these fraudulent practices, and some specifically advised the Select Medical/NovaCare office employees that engaging in these practices would be committing Medicare fraud.

42.     When the Select Medical/NovaCare office employees reported to Delgado that the physicians refused to re-date and re-sign the Medicare forms for services already rejected by Medicare, Delgado was undeterred. Delgado instructed NovaCare office staff and physical therapists to re-date and forge the physician signatures for submission to Medicare. Once completed, Delgado saw that these fraudulent and forged documents were sent to Medicare for payment. Plaintiffs-Relators believe that hundreds of fraudulent claims were submitted to Medicare because of this illegal practice.

## XI.

## FORGERY OF HCFA 1500 FORMS

43.     As recently as March of 2002 and for a time period both prior to and after March of 2002, Defendant Select Medical submitted fraudulent HCFA 1500 Forms seeking payment for services by improperly using the Medicare billing numbers belonging to licensed physical therapists that had left the employment of Defendant Select Medical over a year before the dates when the Select Medical Medicare services were allegedly rendered. Defendant Select Medical also forged the signatures of those departed licensed physical therapists when submitting the fraudulent claims for payment.

44.     Upon information and belief, Defendant Select Medical submitted hundreds of false claims by improperly using Medicare provider numbers of licensed physical therapists that had left Select Medical several months before the dates when the Select Medical Medicare services were allegedly rendered and forging the signatures of the departed therapists on HCFA 1500 Forms without their knowledge or consent.

45.     Every HCFA 1500 Form contains the following certification: "I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally performed by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by

Medicare or CHAMPUS regulations." Thus, by forging the signatures of licensed physical therapists who were no longer even employed with Defendant Select Medical at the time treatment was rendered, the HCFA 1500 Forms submitted by Defendant Select Medical for payment were fraudulent and in clear violation of the certification contained on the HCFA 1500 Form itself.

## XII.
## ILLEGAL WAIVER OF CO-PAYS

46. Medicare requires the payment of a 20% co-insurance payment, which if not paid by commercial insurance must be paid by the patient.

47. In order to encourage its patients to use its therapy services, Select Medical routinely waives the collection of co-pays from patients who do not have the commercial insurance to cover the co-payment.

48. Select Medical's waiver of co-pays is illegal because it improperly encourages patients to use Select Medical's therapy services and is in direct violation of Medicare regulations requiring that providers make all efforts to collect co-pays unless it is verified that the patients are financially unable to make the payments.

49. Select Medical makes no effort to determine the ability of the patients to make the co-payments before it waives the co-pays.

## XIII.
## ILLEGAL DISCOUNTS AS PART OF CASH SIPHONING SCHEME

50. Select Medical had a policy of encouraging cash payments by patients.

51. Select Medical has a policy of charging cash paying customers a flat fee of $55 regardless of the therapy provided. This is far below the rates Select Medical charges Medicare and is a substantial discount from the Medicare rates.

52. Medicare regulations provide that Medicare must be given the lowest rate being provided to patients unless certain specific exceptions, such as negotiated contracts with providers who guarantee a volume of patients, are met.

53. Select Medical's granting of cash discounts to any customers who pay cash constitutes a practice of granting discounts that is illegal under Medicare regulations.

54. Select Medical encourages cash discounts because the management of Select Medical is siphoning cash from the clinics without reporting it on the books of the Select clinics.

55. Beginning in or about April of 2001, Thomas Moriarty began directing relator Rita Kaye, to collect all cash payments from the nine Nevada clinics, place the cash in overnight UPS envelopes, and forward the cash to Thomas Moriarty at Select Medical's central billing office in California.

56. When Kaye informed Moriarty that the cash had to be deposited in the bank accounts in order to reconcile the clinics' books, Moriarty informed Kaye that he was working under the direct supervision of Rocco Ortenzio, Select Medical's Chairman of the Board, and that Kaye should do as Mr. Moriarty instructed or she would be fired.

57. So far as Ms. Kaye was able to determine, Thomas Moriarty was not a Select employee and in fact was an outside "consulatant" for Mr. Ortenzio.

58. Ms. Kaye complained to her supervisor, Patty Van Tasel, who worked in NovaCare's Phoenix Arizona billing office. Ms. Van Tasel told Ms. Kaye to disregard Mr. Moriarty's instructions and to deposit the cash and send only deposit slips and cash logs to Mr. Moriarty.

59. Shortly after giving Ms Kaye these instructions, Ms Van Tasel was fired and escorted from her office.

60. Ms. Kaye then contacted Select Medical's Reimbursement Director Donna Haydel, who is located in the Select Medical's central billing office in California.

61. Ms. Kaye informed Ms. Haydel that not all the cash being mailed to California was not being posted to the patient accounts. Ms. Kaye also informed Ms. Haydel that there could be not accurate accounting because Mr. Moriarty had instructed Ms. Kaye not to place coins in the overnight envelopes so any attempt to reconcile the cash could not be accurate. Also there were no records sent with the cash payments being received by Mr. Moriarty.

62. Ms. Haydel instructed Ms. Kaye to follow Mr. Moriarty's directions about sending the cash payments overnight because Mr. Moriarty worked directly for Rocco Ortenzio.

63. In June of 2001, Ms. Kaye complained directly to Nova Care's President, Edward Miersch, and Nova Care's Chief Financial Officer, Mark Moore and advised them of the practice. Ms. Kaye asked Mr. Miersch to come to Las Vegas so that she could show him that the cash payments that were being sent overnight to Mr. Moriarty were not being posted to patient accounts.

64. Mr. Miersch said that he would come to Las Vegas to direct the matter directly but he never did so.

65. Instead in June of 2001, Mr. Moriarty and Alex Delgado came to Rita Kay's office and fired her.

66. At that time, Mr. Moriarty emptied the cash from the clinic safe and placed the cash in his briefcase. He then directed Ms. Kaye's staff to collect all deposit records and cash logs and provide them to Mr. Moriarty.

67. Select Medical's cash collection scheme is a violation of the Medicare discount regulations. Select Medical's practice of not recording the cash payments on the patient accounts also led to the patients being improperly balanced billed and to inflation of Select Medical's account receivables.

## COUNT I

## FALSE CLAIMS ACT VIOLATION – 31 U.S.C. §3729 et seq

68. Paragraphs 1 through 67 above are incorporated herein by reference as if set forth at length.

69. Defendants knowingly caused to be presented false or fraudulent claims against the Federal Medicare/Medicaid Program.

70. Defendants made and used false and fraudulent statements or caused false and fraudulent statements to be made or used for the purpose of aiding in the obtaining of improper Medicare/Medicaid reimbursements. These claims were fraudulent for the various reasons set forth in this Complaint.

71. The government of the United States has made and will make payment upon false and fraudulent claims and thereby suffer damages. The Untied States is entitled to full recovery

of the amount paid by the Medicare/Medicaid program pursuant to the submission of false claims, which Defendants caused to be submitted.

72. Plaintiffs believe and aver that they are an original source of the facts and information on which this action is based.

WHEREFORE, Relator-Plaintiffs, on behalf of themselves and the United States government, requests the following relief:

1. Judgment against each Defendant in the amount of three (3) times the amount of damages the United States of America has sustained, plus a civil penalty of $10,000.00 for each action in violation of 31 U.S.C. 3729 and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct and the cost of this action with interest.

2. That the Relator-Plaintiffs be awarded all costs incurred, including reasonable attorney's fees.

3. In the event that the United States proceeds with this action, Relator-Plaintiffs be awarded an appropriate amount for disclosing evidence or information that the United States did not possess when this action was brought to the government. The appropriate amount is not greater than twenty-five percent (25%) of the proceeds of the action or settlement of a claim. The amount awarded to Relator-Plaintiffs also includes the results of government actions or settlement of claims resulting from the expansion of claims through the government's further investigation directly generated from or attributable to Relator-Plaintiff's information.

4. Such other relief as this Court deems just and appropriate.'

## COUNT II

## CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT

73. Paragraphs 1 through 72 above are incorporated herein by reference as if set forth at length.

74. As set forth above, Defendants and their co-conspirators conspired with one another to defraud the United States government by submitting false and fraudulent claims to the federal Medicare/Medicaid Programs as is more fully set forth above.

75. In furtherance of the conspiracy, Defendants made and used false and fraudulent statements or caused false and fraudulent statements to be made or used for the purpose of aiding in the obtaining of improper Medicare/Medicaid reimbursements. These claims were fraudulent for the various reasons set forth in this Complaint.

76. The government of the United States has made and will make payment upon false and fraudulent claims and thereby suffer damages. The United States is entitled to full recovery of the amount paid by the Medicare/Medicaid program pursuant to the submission of false claims, which Defendants caused to be submitted.

77. Plaintiffs believe and aver that they are an original source of the facts and information on which this action is based.

WHEREFORE, Relator-Plaintiffs, on behalf of themselves and the United States government, request the following relief:

1. Judgment against each Defendants in the amount of three (3) times the amount of damages the United States of America has sustained, plus a civil penalty of $10,000.00 for each action in violation of 31 U.S.C. 3729 and the appropriate fines and penalties for violating the protective federal laws applicable to the fraudulent and false conduct and the cost of this action with interest.

2. That Relator-Plaintiffs be awarded all costs incurred, including reasonable attorney's fees.

3. In the event that the United States proceeds with this action, Relator-Plaintiffs be awarded an appropriate amount for disclosing evidence or information that the United States did not possess when this action was brought to the government. The appropriate amount is not greater than twenty-five percent (25%) of the proceeds of the action or settlement of a claim. The amount awarded to Relator-Plaintiffs also includes the results of government actions or settlement of claims resulting from the expansion of claims through the government's further investigation directly generated from or attributable to Relator-Plaintiff's information.

4. Such other relief as this Court deems just and appropriate.

## COUNT III

### WRONGFUL DISCHARGE OF REALTOR RITA KAYE - 31 U.S.C. §3730(h)

78. Paragraphs 1 through 77 above are incorporated herein by reference as if set forth at length.

79. At all times material hereto, Relator-Plaintiff Kaye was an employee of Defendants.

80. The illegal practices in which Defendants engaged, and which Relator-Plaintiff Kaye disclosed to her supervisor constituted Medicare fraud and are violative of the False Claims Act, 31 U.S.C. § 3729 *et seq.*

81. As set forth above, Relator-Plaintiff Kaye has been threatened, harassed, and discriminated against because of her discovery and notification to her supervisors of Defendants' violations of the False Claims Act.

82. Relator-Plaintiff Kaye was terminated in violation of the False Claims Act, 31 U.S.C. § 3730(h).

83. Relator-Plaintiff Kaye at all times acted lawfully and in good faith to acquire information and rectify Defendants' fraudulent billing practices that violated the False Claims Act.

84. As a direct and foreseeable result of Defendants' harassment, retaliation and constructive discharge of Relator-Plaintiff Kaye her questioning of Defendants' illegal billing practices, Relator-Plaintiff Kaye has been deprived of significant income, bonuses and other valuable benefits due her, has had her reputation in the medical community damaged and maligned, and has continued to suffer great economic harm.

85. Defendants' must, pursuant to 31 U.S.C § 3730 (h), make Relator-Plaintiff Kaye whole in connection with the economic losses sustained by her as a result of Defendants' retaliatory actions taken against her, including double the amount back payments of salary, and other benefits owed, damages for harm to her reputation and such other damages which are just and proper.

WHEREFORE, Relator-Plaintiff Kaye requests this Court to enter judgment against Defendants for an amount in excess of $100,000, plus interest on all sums owed, litigation costs,

attorneys' fees, and award all other special damages, and such other equitable and injunctive relief as this Court deems appropriate.

DATED this 10 day of June, 2003.

> LAW OFFICES OF BRIAN P. KENNEY
> 1617 John F. Kennedy Blvd., Ste. 640
> Philadelphia, PA 19103
>
> PROVOST UMPHERY LAW FIRM
> 1617 John F. Kennedy Blvd., Ste. 640
> Philadelphia, PA 19103
>
> JOLLEY, URGA, WIRTH & WOODBURY
>
> By: _____
> Martin A. Little, Esq.
> M. Daron Dorsey, Esq.
> 3800 Howard Hughes Pkwy., #1600
> Las Vegas, Nevada 89109
> Attorneys for Plaintiffs